IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DEBRA MARLOWE-HOLMES,

        Plaintiff,

v.                                       Civil Action No.  1:04CV96

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

    Plaintiff, Debra Marlowe-Holmes, (Claimant), filed her Complaint on May 20, 2004 seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on August 31, 2004.[2]

Claimant filed her Motion for Summary Judgment and Brief in Support Thereof on May 31, 2005.[3]

Commissioner filed her Motion for Summary Judgment and Brief in Support Thereof on June 20,

2005.[4]

B.    The Pleadings

          1.    Claimant's Motion for Summary Judgment and Brief in Support Thereof.

          2.    Commissioner's Motion for Summary Judgment and Brief in Support

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 17.

[4] Docket Nos. 22 and 23.

Thereof.

C.    Recommendation

1.    I recommend that Claimant's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly evaluated the listings. Also, the ALJ was not required to obtain a ME. In addition, the ALJ properly determined Claimant's severe impairments. Also, the ALJ properly assessed Claimant's credibility. In addition, the ALJ properly determined Claimant's RFC and posed a proper hypothetical to the VE. Lastly, the ALJ did not unreasonably interfere with Claimant's Counsel's ability to question the VE.

## II. Facts

A.    Procedural History

On November 5, 1996 Claimant filed for Disability Insurance Benefits (DIB). The claim was initially denied on March 18, 1997 and no appeal was filed.

On February 9, 1998 Claimant filed her second application for DIB alleging disability since November 11, 1995. The application was denied initially and on reconsideration. A hearing was held on March 22, 2000 before an ALJ. The ALJ's decision dated July 25, 2000 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on March 12, 2004. This action was filed and proceeded as set forth above.

B.    Personal History

Claimant was 44 years old on the date of the March 22, 2000 hearing before the ALJ. Claimant has a Bachelors of Science degree in nursing and past relevant work experience as a

registered nurse.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability November 11, 1995 - July 25, 2000:

**BC Research Institute for Child and Family Health**
**Aubrey J. Tingle, MD 9/5/95 Tr. 183**
•       Impression: The results clearly establish the presence of high "immune" levels of
        antibody to rubella virus following immunization (with measles, mumps, rubella vaccine)
        on April 18, 1988.

**Beckley Neurological Clinic**
**Adnan Silk, M.D.  5/29/96 Tr. 184**
•       Impression: Low back pain and left leg pain due to a herniated disc at L 4-5 on the left
        side.

**Raleigh Radiology, Inc.**
**12/3/95 Tr. 215**
•       Impression: Degenerative disc disease and small left hnp L4-5. Degenerative disc disease
        L5-S1.

**Raleigh Radiology, Inc.**
**11/21/95 Tr. 216**
•       Impression: Scant scoliosis, convexed toward the left. No significant degenerative
        change. Oblique views may be desired to exclude (illegible) effect, though there is no
        evidence of spondylolisthesis.

**Summersville Memorial Hospital**
**K.C. Shah M.D. 5/19/96 Tr. 219**
•       Impression: Small disk prolapse at L4 L5 to the left of the midline.

**Saint Francis Hospital**
**Alfredo Velasquez, M.D. 5/22/96 Tr. 222**
•       Diagnosis: Herniated disk between L4 and L5

**Saint Francis Hospital**
**E.A. Hansbarger, Jr. MD 5/22/96 Tr. 225**
•       Diagnosis: Dorsal lamina L4-L5; disc material showing degenerative change from L4-5.

**Saint Francis Hospital**
**5/21/96 Tr. 226**

- Impression: No active disease.

**Neurological Associates, Inc.**
**Alfredo Velasquez, M.D. 6/12/97**
- Opinion: In my opinion the small herniate disc that was noted at L5, S1 on the right cannot explain all of her problems. She had bilateral pain mostly on the right side nad also on the left side.

**Neurological Associates, Inc.**
**Alfredo Velasquez, M.D. 4/10/97 Tr. 238**
- Diagnosis: Herniated lumbar disc.

**Neurological Associates, Inc.**
**Alfredo Velasquez, M.D. 3/10/97 Tr. 241**
- Diagnosis: Herniated lumbar disc.

**Neurological Associates, Inc.**
**Alfredo Velasquez, M.D. 6/13/96 Tr. 253**
- Diagnosis: Herniated lumbar disc.

**Neurological Associates, Inc.**
**11/16/96 Tr. 256**
- Impression: Lumbosacral muscle strain with nerve root irritation of L4, L5.

**Psychiatric Review Technique**
**Samuel Goots, Ph.D. 11/12/98 Tr. 314-322**
- Impairment(s) Not Severe.
- Affective Disorders
- Disturbance of mood, accompanied by a full or partial manic or depressive syndrome
- Slight restriction of activities of daily living.
- Slight difficulties in maintaining social functioning.
- Seldom deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)

**Residual Physical Functional Capacity Assessment**
**James Kuzman 11/12/98 Tr. 323-330**
- Exertional limitations: Occasionally 20 lbs., frequently 10 lbs., stand and/or walk 2 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
- Postural limitations: Should never climb, all others occasionally limited.
- Manipulative limitations: None established.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: Avoid concentrated exposure to extreme hot, cold and heights.

**Residual Functional Capacity Assessment**
**2/18/99 Tr. 373-377**
- Sit for 5-10 minutes, walk for 2 minutes, stand for 2 minutes. Sit 1 of 8 hours, walk 5-10 min of 8 hours and stand 5-10 min of 8 hours.
- Should never climb, balance, stoop, kneel, crouch, crawl, stretch reach, squat and bend.
- Restrictions on exposure to environmental hazards, fumes, dust, cold weather temperatures and machinery, jarring or vibrations.

**Psychiatric Review Technique**
**3/29/99 Tr. 378-386**
- Impairment(s) Not Severe.
- Affective Disorders.
- Disturbance of mood, accompanied by a full or partial manic or depressive syndrome.
- Slight restriction of activities of daily living.
- Slight difficulties in maintaining social functioning.
- Seldom deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.
- One or two episodes of decompensation or deterioration in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms

**West Virginia Disability Determinative Service**
**Arturo Sabio M.D. 5/18/99 Tr. 392**
- Impression: Bronchial asthma. Degenerative disc disease, lumbar spine. Depression.

**Eli Rubenstein, M.D Inc. 5/18/99 Tr. 394**
- Impression: Narrowing L4,L5; L5-S1.
- Normal chest. Some immobility of the right arm.

**Residual Functional Capacity Assessment**
**Hugh M. Brown, M.D. 6/15/99 Tr. 398-404**
- Exertional limitations: Occasionally 10 lbs., frequently less than 10 lbs., stand and/or walk 2 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
- Postural limitations: All occasionally.
- Manipulative limitations: None established.
- Visual limitations: None established.
- Communicative limitations: None established.
- Environmental limitations: Avoid concentrated exposure to hazards (machinery, heights, etc.)

**Charleston Area Medical Center**
**J.K. Lilly, M.D. 6/15/99 Tr. 405**
- Can lift 10 lbs., push-pull upper body only 10 lbs., sit 15 min occasionally, stand 5 min

occasionally, walking 5 min occasionally, bending not dependable, reaching occasional, climbing steps modified 1 step at a time occasional, squat, knee and crawl not demonstrated, balance was poor, repetitive arm control occasional, repetitive foot control not evaluated. Hand assessment - simple grasp, push-pull, low speed assembly appears to be intact.

- She reports no functional limitations that would prohibit her from returning to gainful employment with hand issues.
- On this day claimant demonstrated a Physical Demand capability in a SEDENTARY range with max. 10 lbs. occasional force.

**Charleston Psychiatric Group, Inc.**
**Teresa D. Smith, Ph.D. 7/9/99 Tr. 417**
- Conclusions: Debra Ann Holmes is operating in the low average range on intellectual functioning. She appears to have functioning consistent with educational attainment.
- A learning disability is not present. She is currently showing a marked amount of emotional distress. Anxiety was markedly present in test results. Depression was pronounced in the test protocol.
- She had low drive and low energy level. There was evidence of low frustration tolerance. She is realistic in self-concept. Her usual response to problems, conflicts, or stress is adaptive and useful. Psychological insight is acceptable. She would accept psychological/psychiatric treatment if offered.

**Charleston Psychiatric Group, Inc.**
**Ralph S. Smith, Jr. M.D. 7/9/99 Tr. 420-421**
- Diagnosis:
- Axis I: Major Depression, Chronic Pain Syndrome with Psychological and Physical Factors. Axis II: Undetermined. Axis III: Lumbar Syndrome. Axis IV: No other Psychosocial Stressors. Axis V: GAF=65 (Current)
- Assessment and Opinion:
- She exerts no energy into any life activities at the moment. She has Major Depression, partially treated by the medication prescribed by her family physician. This major depression appears to be stimulated by the abuse she received from her ex-husband. The Chronic Pain is related to her 11/11/95 injury. She could benefit from psychiatric intervention but appears to have little resources to obtain it. She is an adequate candidate for the spinal cord stimulator.

**OASIS**

**Jeffrey T. Boggess, Ph.D. 7/19/99 Tr. 425**
- Diagnostic impressions: Axis I: 296.32 Major Depressive Disorder, Recurrent, moderate. 307.89 Pain Disorder Associated with both Psychological Factors and a General Medical Condition.
- Axis II: V71.09 No Diagnosis.
- Axis III: Failed back syndrome; facet syndrome; L-4 and L5-S1 HNP; urinary incontinence.

**OASIS**
**H.S. Ramesh, M.D., M.S. 7/20/99 Tr. 428**
- Impressions: Failed back syndrome. Facet syndrome. L4-5 and L5-S1 HNP. Depression. Urinary incontinence.


**OASIS**
**Stephen Summers, LPT 7/20/99 Tr. 431**
- Assessment: The patient is s/p a lumbar laminectomy in May of 1996. She is also displaying some signs and symptoms of an L5-S1 radiculopathy.


**The Day Surgery Pain Management Center**
**J.K. Lilly, III, M.D. 2/18/99 Tr. 436**
- Diagnosis: Lumbosacral radiculitis, post laminectomy syndrome.


**The Day Surgery Pain Management Center**
**J.K. Lilly, III, M.D. 8/16/99 Tr. 451**
- Diagnosis: Post laminectomy syndrome with persistent lumbosacral radiculitis.


**Mark Younis, M.D. 2/7/99 Tr. 473**
- Impression:
- Right Hip: Normal examination.
- Left Hip: Normal examination.
- Lumbar Spine: No acute bony injury.


**Stonewall Jackson Memorial Hospital**
**Steve Barnett, M.D. 12/29/99 Tr. 274-275**
- Impression:
- Disc space narrowing with secondary degenerative changes at L4-5. There is also increased bone density on the left side at L4-5 which might reflect post-operative and hypertrophic sclerosis or possibly facet joint disease. There is also probably some mild narrowing at L5-S1, though this level is not particularly well-seen.
- Impression:
- Post surgical changes at L4-5 due to prior disc surgery. I suspect a combination of osteophyte, scar tissue, and probably a small amount of protruding disc material at this level which indents the anterior aspect of the dural sac and causes potential compromise of the exiting nerve root and lateral recess on the left. There is also posterior disc protrusion at L5-S1 with enhancement with contrast material suggesting that there is some associated inflammation around the disc or in the disc. It does not seem to produce any significant neural impingement, however.


**Carol J. Rancaglione, M.D., Inc.**
**12/20/99 Tr. 485-486**
- Impressions:

- (1) Menopausal state with much emotional turmoil.
- (2) Hypokinetic musculoskeletal deficiency disease with prolonged, profound deconditioning in the extreme with multiple unanatomic complaints of pain/numbness/stiffness extreme to the point of utter gross dysfunctional behavior with no demonstrable objective physical/pathological explanation.
- (3) Divorced individual with ex-husband stalking caused change of residence 11 times in the past 2 years.
- (4) Dysfunctional family, daughter beat her up and the son and daughter "robbed me blind."
- (5) Completely unco-operative throughout the history/physical examination process.
- (6) By history, shots of Epinephrine for rubella viremia/asthma, said to have had only one shot in the past 6 months.
- (7) By history, prolapsed mitral valve diagnosed at Summersville Memorial Hospital by a physician of whom it was said "she is no longer there."
- (8) By record, Thomas Memorial Hospital admission 2 weeks in April 1995 for "nervous breakdown" and treatment of depression by Dr. Russ (illegible).
- (9) By history, 1980, fracture of left leg by abusing husband, now said with recovery having occurred.
- (10) By history, applied for Social Security Disability benefits, date not remembered.
- (11) Injury in November 11, 1995 while attempting to pull up in bed a ventilator patient. After much treatment by many physicians, physical therapists, neuroprobe, acupuncture, epidural steroid injections, and lumbar laminectomy, supposedly L-4 left, all since Nov. 11, 1995, condition has deteriorated to the present stated which there is overwhelming disability/injury/illness behavior with much overreaction, symptom magnification, symptom misinterpretation, evasiveness, equivocation, frank unco-operation, and what appears to be voluntary tearfulness repeatedly, all of which is utterly disproportional to the presence of any objective evidence of bodily abnormality as an explanation for these findings.
- (12) Lumbar disc disease with or without herniation would not begin to explain this picture as the picture is completely unanatomic and ostensibly simulates a total dysfunctional behavior.
- (13) Current use of a walker for the past 4 or 5 months said to have been prescribed by current family physician, Susan Wantz, M.D. of Summersville, WV after a fall that caused a broken toe, the exact one could not be recalled.
- (14) Tubal ligation and lumbar discectomy, May 21, 1996, have been the only surgical treatments reported. The date of the tubal ligation was said to be "centuries ago."
- (15) By x-ray, evidence of significant intervertebral disc disease at the L-4/5 level with 50% disc space narrowing, end plate irregularity/sclerosis and some anterior marginal osteophytosis, along with 10% disc space narrowing at L-5/S-1 with minimal end plate irregularity/sclerosis with no marginal osteophytosis. Because co-operation for x-ray study was poor, the possibility of bilateral pedicle defects at L-5 cannot be excluded.

**KVR**
**Carl B. Binns, M.D. 12/9/99 Tr. 504**

- Impression:
- Thoracic spine: Normal thoracic spine.
- Lumbar spine: Lower lumbar degenerative changes with disc space narrowing at L4-5.
- Cervical spine: Nothing abnormal seen, visualization is somewhat limited.

**Worker's Compensation Division**
**Joseph A. Snead, M.D. 6/24/00 Tr. 520**
- Clinical diagnosis: Lumbar disc displacement without myelopathy.

**Summersville Memorial Hospital**
**Ansuya Amin, M.D. 9/27/00 Tr. 525**
- Impression:
- Acute Abdomen: Normal Chest.
- Abdomen: Normal abdominal examination.

**Stonewall Jackson Memorial Hospital**
**Robert Smith, M.D. 2/21/01 Tr. 535**
- Impression: Negative barium enema examination of the colon.

D.    <u>Testimonial Evidence</u>

<u>1. Claimant</u>

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 551,

552-53):

Q    Okay.  Has your condition gotten better since then or worse or stayed the same?

A    I would say it's worse because sine the surgery, my left leg gives away and I fall

all the time and injure myself.  I herniated another disk in falling, I've broken toes, and that's

why I have the walker so I'm more stable because my leg will give out on me without any

warning.

Q    How often does that happen?

A    Well, it happens - - I was falling three and four times a month.

Q    The only thing I can tell you is the only way that I can even s[i]t at home for any

time at all is I have to be in the recliner with two pillows and my legs up; otherwise; I have

excruciating pain.  And then when I am in that position, it still hurts but it'll maybe relieve just a little of the pain.

Q        Okay.  Now how would you rate the pain that you feel on a scale of one to 10 where one is not too bad and 10 is really horrible? How would you classify the pain at an average time?

A        Probably about a sever or - -

Q        And then - -

A        And at its worst time it's a 10.

Q        Well, what - - and how often does it get to that level?

A        Frequently.  I mean, I go around praying to God that I can take one more step.  I think I'm going to end up in a wheelchair because my legs don't want to let me walk.

Q        Now where is the pain located then in terms of your back, legs?

A        In my - - the lower part of my back and then I have pains that run down both of my legs.

Q        Now is the pain - - when - - is the pain always in your legs or does it kind of come down there?

A        It's always there.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 582-):

Q        Okay.  Now let me give you a hypothetical question.  If we assume a person of the

same age, education, and work experience as the Claimant and assume a person who could - - who's limited to sedentary work as that's defined in the Commissioner's regulations, assume a person needs to change position every half hour for a brief period of one to two minutes and the job should not involve exposure to extremes of heat or cold, the job should not involve no significant climbing, balancing, stooping, kneeling, crouching, or crawling. And let's say the job should not involve no significant contact with the general public. Would that permit any of these - - the nurse consultant or nurse or the hospital admission clerk?

A       Okay. It would rule out the hospital admission clerk because of the contact with the general public.

Q       Yeah. Yeah.

A       It wouldn't rule out the nurse consultant because the person doesn't have contact with the general public.

Q       Okay. Now, if we look at unskilled work and add in that there'd be no work with detailed or complex instructions and no close concentration or attention to detail for extended periods and no more than occasional changes in the work setting and no work in fast-paced or assembly line work, no work in close coordination with or in close proximity to more than six co-workers, would there be any jobs, any unskilled jobs, that such a person could do, including all the other that I added in the original hypothetical?

A       Right. I was taking in account with the no significant contact and no extremes. Yes, your honor.

A       Sedentary , unskilled is surveillance system monitor. And you're looking at 200,000 in the national economy, and, in the state of West Virginia, you're actually looking at

3,000.

  E.  <u>Lifestyle Evidence</u>

  The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Can lift 5 pounds. (Tr. 555).

- Can use a knife and fork to cut meat. (Tr. 564).

- Reads the bible. (Tr. 566).

## II. The Motions for Summary Judgment

A.  <u>Contentions of the Parties</u>

  Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ failed to properly evaluate the listings. Also, Claimant argues that the ALJ was required to obtain a Medical Expert (ME). In addition, Claimant asserts that the ALJ failed to properly determine Claimant's severe impairments. Also, Claimant contends that the ALJ failed to properly assess Claimant's credibility. In addition, Claimant argues that the ALJ failed to properly determine Claimant's RFC and posed an improper hypothetical to the VE. Lastly, Claimant asserts that the ALJ unreasonably interfered with Claimant's Counsel's ability to question the Vocational Expert (VE).

  Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly evaluated the listings. Also, Commissioner maintains that the ALJ was not required to obtain a ME. In addition, Commissioner asserts that the ALJ properly determined Claimant's severe impairments. Also, Commissioner

contends that the ALJ properly assessed Claimant's credibility. In addition, Commissioner argues that the ALJ properly determined Claimant's RFC and posed a proper hypothetical to the VE. Lastly, Commissioner maintains that the ALJ did not unreasonably interfere with Claimant's Counsel's ability to question the VE.

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.    The Social Security Act

13

requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hayes v.  Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Social Security - Claimant's Credibility - Pain Analysis</u>. The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996).

11. <u>Social Security - Treating Physician - Controlling Weight</u> - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). <u>See also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990).

12. <u>Social Security - Ultimate Issue</u>. Whether an individual is disabled or able to work is an

issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." Id.

13. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

C. <u>Discussion</u>

<u>1. Musculoskeletal Listing</u>

Claimant maintains that the ALJ failed to compare the requirements of the listing to the evidence of record. Commissioner counters that the ALJ properly determined that Claimant did not meet Listing 1.05(C).

The ALJ stated that the "medical evidence indicates that the claimant has rubella viremia; vertebrogenic disorder; asthma; and depression. These impairments, in combination, are 'severe' within the meaning of the Regulations; but they are not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 31). The ALJ then

discussed Listing 1.05(C) in particular and stated that the objective medical evidence did not support a finding that Claimant met or equaled Listing 1.05(C). (Tr. 31). Throughout the decision the ALJ analyzed the objective evidence that he found not to have met or equaled Listing 1.05(C). (Tr. 31-34). The ALJ also discussed that Claimant's argument was that she met Listing 1.05(C) not in one single time, but in separate reports over a period of time. (Tr. 31). The ALJ stated that "[t]he absence of all required objective findings on the same examination raises two issues; First, if the required finding was not present 'chronically', so to speak, doubt exists that the finding was actually present when noted on a single examination; and second, the lack of chronicity may be evidence of change or improvement in the claimant's condition since the previous examination" (Tr. 31). Therefore, the ALJ properly evaluated the Listing requirements.

Also, Claimant maintains that a remand is in order because a change in the musculoskeletal listing took place while this case was pending at the Appeals Council. Claimant's own argument is the reason why this case should not be remanded. The change in the listing took place after the case was reviewed by the ALJ. The period of adjudication for this case is November 11, 1995 - July 25, 2000, which is the date of the ALJ's decision. A change in the listings that took place after the date of the ALJ's decision July 25, 2000 does not affect this case.

## 2. Medical Expert

Claimant argues that the ALJ erred by failing to obtain the advice of a medical expert (ME) when evidence became available that Claimant needed a walker and two canes.

Claimant cites SS96-6p to support his claim that the ALJ was required to obtain a ME. "An administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the

administrative law judge or the Appeals Council may change the State Agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments. When an updated medical judgment as to medical equivalence is required at the administrative law judge level . . . the administrative law judge must call on the services of its medical support staff." SSR 96-6p.

Claimant's argument has no merit. SSR 96-6p clearly states that a ME is required when the ALJ or the Appeals council opines that additional medical evidence may change the State Agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments. In this case neither the ALJ or the Appeals Council opined that additional medical evidence may change the State Agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments. Accordingly, a ME was not required. Therefore, the ALJ did not err by failing to obtain a ME.

### 3. Severe Impairments

Claimant contends that the ALJ ignored many of Claimant's severe impairments. Commissioner counters that the ALJ properly evaluated Claimant's impairments.

The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908. An impairment or combination of impairments is not severe if it does not significantly limit a Claimant's physical or mental ability to do basic work activities. The ALJ determined that Claimant severe impairments include rubella viremia, vertebrogenic disorder, asthma,

and depression because those impairments were supported by the medical evidence. Also, the ALJ acknowledged the diagnosis that Claimant contends were ignored. The ALJ noted Claimant's difficulties as a result of urinary incontinence, diarrhea, anxiety, and panic attacks. (Tr. 32). However, the ALJ did not find those diagnosis to be severe impairments. Therefore, the ALJ did not ignore Claimant's severe impairments.

### 4. Credibility

Claimant maintains that the ALJ's credibility determination is invalid due to the ALJ's lack of understanding of the Claimant's mental and physical diagnoses. Commissioner counters that the ALJ's credibility finding is supported by substantial evidence.

The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

The ALJ stated that the "objective laboratory testing thus does show a medically determinable condition that could reasonably be expected to produce some pain and symptoms of the type alleged by the claimant, but certainly not to the intensity and frequency she claim. The ALJ further stated that Claimant's "extreme and severe alleged symptoms are not supported by the objective medical evidence of record, not by the other evidence in the record. This satisfies the first prong of Craig. The ALJ then noted that "[a]lthough the claimant alleges immobility without the use of a walker, the objective examination of December 9, 1999 showed evidence of considerable recent ambulatory

activity." (Tr. 34). "Claimant testified that she was injured at work on November 11, 1995 and has not been able to return to work since then. . . . she stated that she was falling frequently (three or four times a month) and even broken toes because of falling. This testimony seems to be a bit exaggerated, however, because the claimant reported to Dr. Roncaglione on December 9, 1999 that she fell in 1997 (but she could not remember how or when), and she fell again in 1999 at which time she broke her toe (but she could not remember which toe). [Exhibit 31F]." (Tr. 32). The ALJ noted Dr. Smith's report that Claimant "understood instructions readily and her concentration was described as adequate. However, her attitude toward the testing was 'characterized by exaggeration of limitations,' and effort expended toward task completion was 'inconsistent.' Her testing resulted in a 'profile obtained almost exclusively by individuals who are consciously determined to provide mostly incorrect responses.' The examiner opined that the test analysis suggested that the claimant likely knew the correct responses and consciously provided incorrect responses." (Tr. 32-33). The ALJ noted Dr. Roncaglione's report that "claimant was a very poor historian and was totally and completely uncooperative. He indicated that the claimant was overly dramatic, and she moaned and groaned throughout the entire examination. The doctor noted that movement or manipulation of any of the lower extremity joints was said to cause low back pain, yet there was not evidence of pathology to support such subjective complaints. The claimant used a walker at the time of the examination and needed help getting dressed/undressed and to get onto and off of the examination table. She reported that she was totally incapacitated and required virtually total care in her home from her boyfriend, with whom she lives. Despite the claimant, however, the doctor noted that the claimant had significant callouses on the tibial aspects of both great toes at the IP joint level and at the metatarsal phalangeal joint level, as well as horseshoe callouses on the heels of both feet, 'indicating

considerable ambulatory activity recently.'" (Tr. 33). This satisfies the second prong of <u>Craig</u>. Therefore, the ALJ properly determined Claimant's credibility.

Also, Claimant argues that the ALJ's credibility determination is invalid due to his misstatements regarding Dr. Smith's report. Claimant does not allege that Dr. Smith did not make the opinions that the ALJ cited. (Tr. 411-421). Dr. Smith did in fact make those statements and opinions and the ALJ properly took them into consideration when making his credibility determination.

### 5. Treating physician

Claimant maintains that the ALJ erred by failing to give controlling weight to Claimant's treating physician, Dr. Wantz. Commissioner counters that the ALJ properly analyzed and weighed the medical evidence.

"On December 23, 1998, Dr. Wantz, a treating physician, completed a report stating that the claimant 'will continue to be disabled indefinitely secondary to her injury and remains temporarily totally disabled.' [Exhibit 16F/3]." (Tr. 34). Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." <u>Id</u>.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). <u>See also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v.  U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir.  1990).

Dr. Wantz completed a RFC assessment on February 18, 1999 where he "opined that the claimant would not be able to perform even sedentary work, not even on a part time basis, but also stated that 'she has had exacerbation at home where she has had difficulty getting around due to pain she reports.' [Exhibit 17F].  Dr. Wantz completed another report on February 11, 2000 stating that the claimant 'is totally disabled and cannot be employed at any job of any kind.' [Exhibit 27F].  The claimant apparently reported to this doctor that her pain and limitations are sometimes exacerbated, yet she testified at the hearing that her pain is constant and severe and totally incapacitates her from any sort of activity whatsoever.  Dr. Wantz's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques.  Also, Dr. Wantz's opinion is inconsistent with other substantial evidence in the case record.  The state agency medical consultants found Claimant capable of performing a limited range of sedentary work.  (Tr. 397-404).  Therefore, the ALJ properly assessed the opinion of Claimant's treating physician.

## 6.  RFC

Claimant argues that there is a lack of substantial support for the ALJ's RFC finding when it was not expressed on a function by function basis, omitted mental limitations due to pain, mental illness and medication effect, omitted the impact of assistive devices, omitted the need for close bathroom facilities and avoidance of pulmonary irritants.  Commissioner counters that the ALJ's RFC finding provided for all of the limitations supported by the evidence.

A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence.  Id.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.

Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

As discussed above the ALJ properly found Claimant not entirely credible. Also, as discussed above, the ALJ assessed the medical evidence. Accordingly, the ALJ determined that Claimant retains the RFC "to perform a limited range of sedentary work. She must be able to briefly change positions at least every one-half hour for a minute or two. She can have no exposure to extremes of heat or cold. She is not able to do any significant climbing, balancing, stooping, kneeling, crouching, or crawling. She must avoid the stress of having any significant contact with the general public." (Tr. 37). Therefore, the ALJ properly determined Claimant's RFC.

## 7. Counsel's Right to Question the VE

Claimant argues that the ALJ unreasonably interfered in counsel's ability to question the Vocational Expert (VE), asserted a legal position that is contrary to the Commissioner's rulings and the law of the circuit, and relied upon an incomplete and inaccurate hypothetical question that did not include all of the Claimant's limitations. Commissioner counters that the ALJ did not interfere with Counsel's right to question the VE.

Claimant's does not cite support that the ALJ unreasonably interfered with his ability to question the VE. Further, Claimant does not cite authority that such behavior warrants a remand. Commissioner notes that near the end of the hearing the ALJ stated to Claimant's counsel "Anything

further we need to deal with?" and Claimant's attorney responded "Nothing further, sir." (Tr. 613). Therefore, the ALJ did not interfere with Claimant's counsel's ability to question the VE.

Claimant again argues that the ALJ must specify the Clamant's RFC on a function by function basis, and posed a hypothetical to the VE based on the RFC. As, discussed above the ALJ properly determined Claimant's RFC and posed a hypothetical to the VE based on that RFC.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly evaluated the listings. Also, the ALJ was not required to obtain a ME. In addition, the ALJ properly determined Claimant's severe impairments. Also, the ALJ properly assessed Claimant's credibility. In addition, the ALJ properly determined Claimant's RFC and posed a proper hypothetical to the VE. Lastly, the ALJ did not unreasonably interfere with Claimant's Counsel's ability to question the VE.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: June 24, 2005

/s/ James E. Seibert

JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE